**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KIMBERLY BURKE,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 18-cv-2068** |
| | : | |
| **DEPUY SYNTHES COMPANIES,** | : | |
| **ET AL.,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**Goldberg, J.**                                                                                  **June 30, 2020**

**MEMORANDUM OPINION**

Plaintiff Kimberly Burke brings this discrimination action against Defendants DePuy Synthes Sales, Inc. and Johnson & Johnson (collectively, "Defendants"). Plaintiff alleges disability discrimination based on Defendants' failure to engage in an interactive process, failure to accommodate her disabilities, and based upon a hostile work environment, all in violation of both the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Count I) and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.* (Count II).

Presently before me is Defendants' Motion for Summary Judgment. For the reasons that follow, I will grant summary judgment in favor of Defendants on all claims.

**I.   STATEMENT OF FACTS**

The following facts are taken from the parties' Statements of Facts ("SOF") together with the exhibits of record. Unless indicated otherwise, these facts are undisputed.

1

Defendant DePuy Synthes Sales, Inc. ("Synthes") manufactures and sells orthopedic surgical implants and instruments used during veterinary surgeries.[1]  (Id. ¶ 6.)  Plaintiff began working for Synthes in 1998 as a Course Coordinator and was later transferred and/or promoted to two other positions before taking on a full time role in 2007 as a "Veterinary Sales Consultant, In-House."  (Defs.' SOF ¶¶ 1, 3–5, 9, ECF No. 25-3.)   Her full time position included maintaining expertise and fully understanding the company's medical device products, continuing relationships with veterinarian surgeons, selling products, and travelling to provide on-site product support and educational programming to existing and potential customers.  (Id. ¶ 12.)  Plaintiff held this position with Synthes through the end of her employment.  (Id. ¶¶ 5, 76, 82.)

### A. **Plaintiff's Duties and Responsibilities as a Veterinary Sales Consultant**

In order to maintain expertise on all Synthes products, teach customers about them, and serve as a technical expert for other Synthes employees, Plaintiff attended and spearheaded multiple trainings both in and out of the office.  (Id. ¶¶ 14–15.)  She represented Synthes at multiple out-of-office trade shows and educational courses by travelling to and staffing booths for long hours, selling Synthes products, and building relationships with potential customers by explaining the company's products.  (Id. ¶¶ 15–17.)  In addition, she was required to travel to clients' surgery centers to develop relationships, increase sales, and assist with complex surgeries.  (Id. ¶ 18.)

Synthes's job description for Plaintiff's role as a Veterinary Sales Consultant, In-House lists the following duties and responsibilities:

1) Receive and promptly respond to veterinary customers' technical and product
   inquiries;

---

[1]     Defendant Johnson & Johnson is the parent company of Synthes.  (Defs.' SOF ¶ 2.)

2)  Develop and follow up on product quotations for new or existing customers;
3)  Attend key society meetings and trade shows to educate surgeons on the Synthes [] product line and generate sales leads;
4)  Continuously work to increase core customer base via cold calling and leads follow-up;
5)  Travel to customers to (1) give product in-services as part of the sales cycle or (2) guide surgeons in complex surgeries;
6)  Liaise with the Power Tools division, finance, customer service and other internal departments, as needed;
7)  Provide technical guidance on vet products to other employees, as required;
8)  Support trade shows and educational workshops, as required;
9)  Continuously improve personal knowledge of veterinary surgical procedures by AO, Synthes and other training opportunities; and
10) Greater than 20% travel within the United States required.

(Id. ¶ 10.)   The job description further indicates that the primary methods of customer communication include "email, telephone, tradeshows and customer visits."  (Id.)

Plaintiff received annual performance goals, which included the following in 2015:

1)  Achieve sales growth within her territory of 7.5%, with sales growth in certain key states of 10% and growth among academic institutions of 5%.
2)  Oversee meeting planning and lead onsite booth logistics for multiple conferences, trade shows, and meetings.
3)  Respond to leads obtained at conferences, trade shows, and meetings within 5 business days.
4)  Support educational labs.
5)  Be fully trained on Synthes's products and new product launches, and proactively promote those products to academic institutions and other customers.
6)  Handle all customer inquiries relating to sales, surgical techniques, and product inquiries for her territory. All customer questions to be answered within 24 hours.
7)  Work hand-in-hand with vet and internal teams to provide customer insights.
8)  Make contact with resident directors at various universities, and proactively schedule and conduct two academic site visits during the year, including hosting a lunch and learn with staff surgeons and residents.

(Id. ¶ 20.)

**B. <u>Morale Falls for Plaintiff and Co-Workers and the Incident with Tim Horan – Late 2013</u>**

Toward the end of 2013, Plaintiff began experiencing increased anxiety, depression, post-traumatic stress disorder, panic attacks with increased frequency, paranoia and suicidal ideation. (Defs.' SOF ¶¶ 29, 36–39). At the same time, morale declined at work for Plaintiff and her co-workers. (<u>Id.</u>) Plaintiff complained to her supervisor that she was feeling isolated from the group and was not accepted by co-workers. (<u>Id.</u> ¶ 29.)

Also in late 2013, Plaintiff reported an incident to her supervisor involving a co-worker, Tim Horan. (<u>Id.</u> ¶ 30.) Plaintiff explained that, while at a social gathering outside of work with co-workers, Mr. Horan confronted her, yelled obscenities, accused her of spending too much time out of the office, and exclaimed that "covering" for her work was becoming too burdensome. (<u>Id.</u>; Pl.'s Resp. to Defs.' SOF ¶ 30, ECF No. 31-2.) Plaintiff indicated that when she reported this incident to her supervisor, she was told to "work it out amongst yourselves." (Pl.'s Resp. to Defs.' SOF ¶ 31.)

Around December 2013, Plaintiff began making negative comments to other co-workers about her supervisor and about her dissatisfaction with her job. (Defs.' SOF ¶ 32; Pl.'s Resp. to Defs.' SOF ¶ 1.) After speaking with Plaintiff and Plaintiff's co-workers about the tension amongst her team, Plaintiff's supervisor grew concerned about the group's morale and lack of cohesion. (Defs.' SOF ¶ 39.)

**C. <u>Plaintiff Receives a Performance Warning – July 2014</u>**

On June 6, 2014, Plaintiff's supervisors and Synthes's Human Resources manager met with Plaintiff, informed her that co-workers reported that she had been speaking negatively about her supervisor, and notified her that she would be disciplined for making these statements. (<u>Id.</u> ¶¶ 42–43.) Plaintiff's performance warning, which she signed on August 13, 2014, noted:

1)  We discussed the importance of you ceasing any negative comments in the presence of your co-workers or others about your manager [].

(Id. ¶¶ 44–46. Defs.' Ex. 3, Maria Cunningham Decl. at Ex. B, ECF No. 25-7.)

**D. <u>Plaintiff's Mental Health in 2014–2015 and Short Term Disability</u>**

Between July 2014 and May 2015, Plaintiff continued having panic attacks at work. (Defs.' SOF ¶ 48.)  She also experienced paranoia, anxiety, depression, and suicidal thoughts. (Id.)  Around May 22, 2015, Plaintiff sought and was approved for short-term disability leave. (Id. ¶¶ 52, 57; Pl.'s Resp. to Defs.' SOF ¶¶ 21–26.)  At the time Plaintiff requested leave, her condition was "severe" and she was unable to perform the essential functions of her position with or without a reasonable accommodation.  (Defs.' SOF ¶ 54.)  Effective May 22, 2015, Plaintiff did not report to work and sought treatment for her panic attacks, depression, suicidal ideation, intense anxiety, and post-traumatic stress disorder.  (Id. ¶¶ 52, 57.)

Plaintiff confirmed that she understood and knew that Synthes's policy allows employees to take short-term disability medical leave for a maximum of twenty-six weeks, after which time their employment becomes inactive and reinstatement is not guaranteed.  (Id. ¶ 71, Ex. 1, Dep. of Kimberly K. Burke ("Pl.'s Dep.") at 194.)  Upon being notified that Plaintiff sought short-term disability benefits, Synthes provided Plaintiff with paperwork for her doctors to complete upon her return to work should she require an accommodation.  (Defs.' SOF ¶ 55.)  Plaintiff was notified that Synthes would "make every effort to evaluate and reasonably accommodate associates with a disability" and that her supervisors would only be consulted with respect to work restrictions in order to determine whether any potential medical restrictions could be accommodated.  (Id. ¶ 56.)

On September 22, 2015, Plaintiff's psychiatrist, Dr. Marjorie Saul, referred Plaintiff for three additional weeks of intensive outpatient therapy.  (Id. ¶ 59.)  Around September 24, 2015,

Dr. Saul reported to Synthes that Plaintiff was experiencing a moderately severe impairment regarding her ability to understand, remember and carry out instructions, make simple decisions, and perform simple tasks.  (Id. ¶ 60.)

### E.  Plaintiff's Submits Return to Work Plan With Request for Accommodations

Pursuant to Synthes's policy, Plaintiff's twenty-six weeks of short-term disability was set to expire on November 19, 2015, after which her employment status would be considered inactive and there would be no guarantee of reinstatement.  (Id. ¶ 75.)  On or about October 23, 2015, Dr. Saul submitted a letter indicating that Plaintiff could return to work as of November 2, 2015 if she were permitted to work full-time from home through November 30, 2015.  (Id. ¶ 61.) Dr. Saul further stated that, after November 30, 2015, Plaintiff could be reevaluated to determine whether she could continue working.  (Id. ¶ 61.)

In response, Synthes evaluated but denied Plaintiff's request, claiming that working from home would not allow Plaintiff to perform several essential functions of her position, such as attending live meetings, completing in-office computer software updates, visiting clients or customers, or attending trade shows.  (Id. ¶¶ 62–63, 66, 69–70.)  Instead, Synthes offered, and Plaintiff accepted, an alternative accommodation—additional medical leave, beyond her twenty-six weeks of short-term disability, during which her position would remain open in anticipation of her return.  (Id. ¶ 70.)

### F.  Plaintiff is Approved for Long Term Disability – November 2015

On November 20, 2015, Plaintiff was approved for long-term disability benefits with Synthes's long-term disability carrier, Prudential Life Insurance Co. of America ("Prudential"). (Defs.' SOF ¶ 72.)  From November and December 2015 and thereafter, several of Plaintiff's co-workers complained to their supervisor about the increased stress, hours, and burden of covering

Plaintiff's duties and responsibilities and claimed that the increased workload was unsustainable. (Id. ¶ 73.)

### G. <u>Synthes's Request for Plaintiff's Return to Work Plan – January 2016</u>

In January 2016, when Synthes did not receive any additional communications from Plaintiff or her physicians regarding a return-to-work plan, Synthes's Director of Human Resources sent a letter to Plaintiff, clarifying that once Plaintiff's long-term disability commenced, her employment status would be considered inactive.  (Id. ¶¶ 74–75.)  The letter indicated that if Plaintiff was seeking to return to work, she was to submit a reasonable accommodation request by January 28, 2016.  (Id.)

Thereafter, on February 1, 2016, Dr. Saul submitted a letter on Plaintiff's behalf, dated January 29, 2016, with a request for accommodation.  (Id. ¶ 76.)  Dr. Saul's note recited Plaintiff's treatment history and stated that, at that time, Plaintiff was substantially limited in her ability to concentrate and interact with others.  (Id. ¶ 78.)  Dr. Saul's note summarized Plaintiff's present and future work capabilities as follows:

> At the present time [Plaintiff] is on long term disability as both this psychiatrist and the consulting psychiatrist agreed that she was unable to return to work full time at the office setting where she was working.  It was suggested that she be able to reintegrate back into the work setting gradually by working from home part time initially.  This could be four hours per day for the first two weeks and then six hours per day for the next two weeks and then full time from home. She would be re evaluated [sic] to see her progress every two weeks.  At the present time, I believe [Plaintiff] could safely work from home four hours per day. She could continue her outpatient treatment and work to increase her work hours over time.

(Id. ¶¶ 77–78.)

Upon receipt of Dr. Saul's letter, Synthes's Director of Human Resources, Synthes's Occupational Health Nurse and Site Lead Nurse, and Synthes's Leave Specialist conferred about Plaintiff's request for accommodation and the nature of Plaintiff's position.  (Id. ¶¶ 79–80.)  The

group concluded that for the reasons previously articulated to Plaintiff in October 2015, a work-from-home accommodation would not allow Plaintiff to perform several of the essential functions of her role.  (Id.)

Therefore, on February 12, 2016, representatives from Synthes's Human Resources and Occupation Health Departments teleconferenced with Plaintiff and explained to her that working exclusively from home would not allow her to fulfill the essential functions of her position.  (Id. ¶¶ 82–83.)  They provided Plaintiff with a counter-proposal that would allow her to perform the essential functions of her position including: 45% of the week spent in the office, 30% of the week spent working from home, and 25% of the week spent in the field with customers.   (Id.)

Dr. Saul determined that Plaintiff's condition would not allow her to work as requested in Synthes's counter-proposal.  (Id. ¶ 84.)  Thus, on March 2, 2016, Plaintiff rejected Synthes's counter-proposal, clarifying that her request for accommodation remained unchanged.  (Id.)

As of March 2, 2016, Plaintiff had been on leave for over nine months, and neither Plaintiff nor her physician could definitively state whether she would be able to return to the office.  (Id. ¶ 85.)  Synthes determined that holding Plaintiff's critical position open for nine months had placed a substantial burden on the company and Plaintiff's co-workers, such that her position needed to be backfilled  (Id. ¶ 86.)

**H.  Plaintiff's Employment Status Is Deemed Inactive – March 3, 2016**

On March 3, 2016, Synthes mailed a letter to Plaintiff stating that because she had declined the company's proposed accommodation and could not specify when, if ever, she could return to the workplace, the company was no longer able to hold her position open and planned to fill her position.  (Id. ¶¶ 89–91.)  The letter further stated that Plaintiff's employment status

was effectively "inactive," but that she would continue to be eligible for long-term disability benefits through the company.  (Id.)

**I.   Dr. Saul's Supplemental Accommodation Request – March 7, 2016**

Four days later, on March 7, 2016, Dr. Saul submitted an addendum to her January 29th letter regarding Plaintiff's request for accommodations.  (Defs.' SOF ¶ 92.)  The addendum stated that after four weeks of at-home part-time work, "[Plaintiff] [sic] work full time from home with the addition of seeing customers in the field and attending meetings in the office as needed."[2]  (Id.)  Synthes points out that this letter did not state when Plaintiff would be able to return to work within the office, or when she would be able to work trade shows or educational courses.  (Id.)

**J.   Plaintiff Remained Unable to Work Through At Least December 2016**

Plaintiff remained on long-term disability with Prudential through May 1, 2016.  (Id. ¶ 97.)  As of late April 2016, Plaintiff remained unable to work, continued to have suicidal ideation, continued having panic attacks, continued being unable to consistently groom or bathe herself, and could not go to the grocery store without getting anxiety.  (Id. ¶ 98.)  On May 1, 2016, Plaintiff's therapist opined that there was "no way [Plaintiff] could be employed at th[at] time," with or without a reasonable accommodation, as [Plaintiff] was "one of the most impaired clients [she] ha[d] treated in an outpatient setting in almost 30 years of practice."  (Id. ¶ 99.)

Prudential terminated Plaintiff's long-term disability benefits on May 1, 2016, at which time Plaintiff's termination from Synthes became effective.  (Id. ¶¶ 100–101.)  Plaintiff contends

---

[2]     While Dr. Saul's March 7th supplemental letter is missing a critical verb, I shall construe it in the light most favorable to Plaintiff and interpret this letter as proposing a return-to-work plan that, after four weeks of part-time at-home work, Plaintiff *could* see customers in the field, as needed.

that her employment was terminated at the time that Synthes sent her the March 3, 2016 letter indicating that her employment was "inactive."  (Pl.'s Resp. to Defs.' SOF ¶ 101.)

**K.  Plaintiff Applies for Social Security Benefits and Lawsuit Against Prudential – 2016**

At some point in 2016, after the conclusion of her employment, Plaintiff applied for social security disability benefits, certifying that she was too disabled to work.  (Defs.' SOF ¶ 103.)  In addition, on November 14, 2016, Plaintiff filed a lawsuit against Prudential, alleging violations of the Employee Retirement Income Security Act ("ERISA") due to an alleged wrongful denial of her long-term disability benefits.  (Id. ¶ 104.)   In her ERISA Complaint against Prudential, Plaintiff certified that from May 1, 2016 through November 2016, she remained unable to return to work, with or without a reasonable accommodation, because she was completely disabled, "unable to perform, on a sustained basis, her prior occupation or any occupation."  (Id. ¶ 105.)  Plaintiff began feeling well enough to work again at some point in 2017.  (Id. ¶ 106.)

**L.  Plaintiff Filed a Charge of Discrimination – September 2016**

On September 20, 2016, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission, raising claims against Synthes.  (Id. ¶ 107.)  Plaintiff received a notice of right to sue letter from the EEOC on or about February 16, 2018.  (Id. ¶ 108.)

Plaintiff filed her Amended Complaint on May 17, 2018, alleging disability discrimination based a failure to engage in the interactive process, a failure to accommodate, and for creating a hostile work environment in violation of both the ADA and PHRA.  (Compl. ¶¶ 61–83.)  After a period of discovery, Synthes filed a motion for summary judgment on all of Plaintiff's claims.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"

that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

Under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), an employer is prohibited from taking an adverse employment action against a qualified individual on the basis of her disability.  42 U.S.C. § 12112(a).  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an adverse employment decision as a result of discrimination."  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

Plaintiff alleges that Synthes violated the ADA and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq.* ("PHRA") by (a) failing to accommodate her disabilities and illegally terminating her employment because of her disabilities; (b) failing to engage in an interactive process, and (c) subjecting her to a hostile work environment.[3]  Synthes and Johnson & Johnson move for summary judgment on all claims.[4]

---

[3]      I will analyze Plaintiff's ADA and PHRA claims simultaneously "because the Acts serve the same goals and are interpreted coextensively."  Castellani v. Bucks Cty. Municipality, 351 F. App'x 774, 777 (3d Cir. 2009).

[4]      As an initial matter, Defendants argue that Johnson & Johnson should be dismissed, claiming that it was never Plaintiff's employer and that its only relationship to this lawsuit is that it is the parent company to Synthes.  Plaintiff agrees.  (Pl.'s Br. in Opp. to Defs.' Mot. Sum. Judg. at 2, ECF No. 31-1.)  Therefore, I will grant Johnson & Johnson's motion for summary judgment and dismiss it from the suit.

### A. **Failure to Accommodate**

Synthes first moves for summary judgment on Plaintiff's claim for disability discrimination based on its alleged failure to accommodate Plaintiff prior to her termination. The elements specific to the failure to accommodate disability discrimination claim are:  (1)  the employee had a disability; (2) the employer knew of that disability; (3) the employee can perform the essential functions of his job with a reasonable accommodation; and (4) the employer failed to provide an accommodation.  Sharbaugh v. West Haven Manor, LP, No. 14-1723, 2016 WL 6834613, at *9 (W.D. Pa. Nov. 21, 2016).  The adverse employment decisions barred by the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also . . . failing to make reasonable accommodations for a plaintiff's disabilities."  Id.  Specifically, the ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Here, Synthes does not dispute that Plaintiff can satisfy the first two prongs—that it knew of Plaintiff's disability of anxiety, depression and post-traumatic stress disorder and that Plaintiff requested an accommodation of working solely from home upon her return to work.  Synthes argues, however, that the undisputed evidence establishes that Plaintiff's requested accommodations would not render her qualified to perform her position's essential functions— the ability to travel and work in the office.

Plaintiff does not contest the travel issue.  Rather, Plaintiff responds that summary judgment is inappropriate because her job description did not require her to be in the office and

because Synthes has failed to explain why her working from home would be unduly burdensome.

To resolve this dispute, I must first consider what constituted the "essential functions" of Plaintiff's position.   I then turn to whether Plaintiff could perform those functions with reasonable accommodations.

1.   Essential Functions of Plaintiff's Position as a Veterinary Sales Consultant, In House

Synthes contends that there is no genuine issue of material fact regarding the fact that two functions of Plaintiff's job were essential:  (1) travel and (2) working in the office.

"Whether a particular function is essential is a factual determination that must be made on a case by case basis upon review of all relevant evidence."  Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quotations omitted).  The United States Court of Appeals for the Third Circuit has cautioned against usurping the role of the jury in the context of deciphering whether a given function is "essential."  Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P., 257 F.3d 273, 279–283 (3d Cir. 2001).

Whether a job duty is an "essential function" turns on whether it is "fundamental" to the position.  "Marginal functions" of the position are insufficient.  Turner, 440 F.3d at 612 (citing 29 C.F.R. § 1630.2(n)(1)); 29 C.F.R. § Pt. 1630, App. 1630.2(n) ("The purpose of this [inquiry] is to ensure that individuals with disabilities who can perform the essential functions of the position . . . are not denied employment opportunities because they are not able to perform marginal functions of the position.").  42 U.S.C. § 12111(8) of the ADA states that, in assessing whether a given job function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written

14

description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

Additionally, the Equal Employment Opportunity Commission's ("EEOC") "Interpretive Guidance" defining "essential functions" states that a function may be deemed "essential" because: (i) the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2).

The EEOC regulations further set forth a non-exhaustive list of evidentiary examples that may assist courts with identifying the "essential functions" of a job: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3). "[N]one of the factors nor any of the evidentiary examples alone are necessarily dispositive." Skerski, 257 F.3d at 279.

Synthes first presses that Plaintiff's ability to travel to certain trainings, events, and tradeshows is an essential function of her position as a Veterinary Sales Consultant, In-House.

The written description for the position of "Veterinary Sales Consultant, In-House" articulates that Plaintiff was to spend more than twenty percent of her time travelling within the United States. (Defs.' SOF ¶ 10.) This description further highlights that Plaintiff must "[a]ttend key society meetings and trade shows to educate surgeons on the Synthes [] product

line . . . ; [t]ravel to customers to (1) give product in-services as part of the sales cycle or (2) guide surgeons in complex surgeries."  (Id.)  Plaintiff's 2015 performance goals also indicate that Plaintiff should "lead onsite booth logistics for multiple conferences, trade shows, and meetings . . . [and] [m]ake contact with resident directors at various universities, and proactively schedule and conduct two academic site visits during the year, including hosting a lunch and learn with staff surgeons and residents."  (Id. ¶ 20.); see 42 U.S.C. § 12111(8) (stating that a written job description "shall be considered evidence" of a job's essential functions).

Plaintiff admits that the above-listed job description and performance goals were in place and that her position required her to travel more than twenty percent of her time to trade shows, medical centers where her surgeon clients were located, and to universities to provide product trainings, customer support, and to sell products.  In short, Plaintiff concedes that travel was pivotal to her position.  As will be detailed further below, this concession weighs heavily in granting Defendants' motion.

Synthes also contends that Plaintiff's ability to work in the office is an additional essential function of her position.  Synthes claims that physically working in the office enabled Plaintiff to attend live meetings, in-person trainings, field customer calls, and complete in-person computer software updates.  Plaintiff disagrees and argues that there "is no position or responsibility in [her] job description that tied her to the office."  (Pl.'s Br. at 12–13.)  Plaintiff also maintains that: (1) Synthes's argument pertaining to the computer software update is trivial and could have been addressed by mailing or dropping off her computer at the office; (2) Synthes previously allowed her work from home for three weeks in 2014; and (3) Plaintiff's supervisor is permitted to reside in California while overseeing Plaintiff's office in Pennsylvania.

Considering the factors in 42 U.S.C. § 12111(8), I find a genuine issue of material fact as to whether the ability work in the office was an essential function.  On one hand, Plaintiff's job description does not list the ability to work in the office as one of the "Position Duties and Responsibilities."  (Defs.' SOF ¶ 10.)  On the other hand, the "Overall Responsibilities" section indicates that the primary methods of customer communication include "email, telephone, tradeshows and customer visits."   (Id.)  Plaintiff's 2015 performance goals state that Plaintiff must "[o]versee meeting planning and lead onsite booth logistics for multiple conferences, trade shows, and meetings [and] [w]ork hand-in-hand with vet and internal teams to provide customer insights."  (Defs.' SOF ¶ 20.)[5]  Both of these statements could create a genuine issue of material fact as to whether Plaintiff was required to work in the office.

Overall, viewing the evidence in the light most favorable to Plaintiff, I conclude that there is a genuine issue of material fact as to whether working in the office was an essential duty. However, it is undisputed that Plaintiff's ability to travel was an essential function.  Accordingly, I must take the next step and consider whether Plaintiff could perform this essential role with or without reasonable accommodations.

> 2.  Whether Plaintiff Could Perform Essential Functions of the Job With or Without an Accommodation

The analysis with respect to the third element of her prima facie case for failure to accommodate is not simply whether Plaintiff could perform the essential functions of her job. Rather, it is whether Plaintiff could perform the essential functions *with or without* a reasonable accommodation.  See Turner, 440 F.3d at 611–12 ("The question we are confronted with . . . is not whether [the plaintiff] can perform the essential functions of her job without reasonable

---

[5]  Plaintiff's argument that Synthes allowed her supervisor to work from California is not persuasive because Plaintiff offers no evidence regarding her supervisor's functions or responsibilities, let alone about how those compare to Plaintiff's position.

accommodation, for clearly she cannot; but, rather, whether she can perform the essential functions of her job *with* reasonable accommodation."). "An employer may be required to restructure a job by reallocating or redistributing nonessential, marginal job functions; however, the employer is not required to reallocate essential functions." Supinski v. United Parcel Serv., Inc., 413 Fed. Appx. 536, 542 (3d Cir. 2011) (citations and quotations omitted). "As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question." Turner, 440 F.3d at 614–15.

Here, Plaintiff concedes that, without an accommodation, she could not perform the essential function of spending over twenty percent of her time working by travelling to customers, trainings, trade shows, and educational events at universities. Thus, my inquiry focuses on whether Plaintiff's proposed accommodation of working solely from home upon her return would allow her to perform the essential function of travelling.

Synthes contends that an accommodation of allowing Plaintiff to work solely from home upon returning to work in March 2016 would not allow her to perform the essential function of travelling. In response, Plaintiff points to Dr. Saul's March 7, 2016 supplemental letter, which states that after four weeks of at-home part-time work, Plaintiff could work full time from home with the addition of seeing customers in the field and attending meetings in the office, as needed. Plaintiff claims that this letter clarifies that she could have worked several hours in the field visiting clients.

The critical problem with Plaintiff's argument is that this proposed accommodation came *after* Plaintiff advised Synthes that she could not travel and they were forced to terminate her. Plaintiff went out on short-term disability leave on May 22, 2015. At some point between October and November 2015, at the end of her short-term disability, Synthes requested

Plaintiff's plan for her to return to work.  At that time, Plaintiff requested to return to work by working entirely from home, with no indication of when she could return to travelling.  Synthes denied this request but granted her additional leave and later followed up with her in January 2016 for a renewed accommodation request.

Plaintiff's renewed request, as set forth in Dr. Saul's January 29, 2016 letter, was identical to her prior request that Synthes already denied.  Plaintiff's renewed request again asked for initial part-time at-home work with no indication of when or whether Plaintiff could return to travelling or working in the office.  Between February and March 2016, Synthes again notified Plaintiff that her proposed accommodation was unacceptable.  Synthes also provided a counter-proposal for accommodations, including: 45% of the week spent in the office, 30% of the week spent working from home, and 25% of the week spent in the field with customers. Upon review, Dr. Saul concluded that Plaintiff's condition would not have allowed her to work in the conditions set forth in Synthes's proposed alternative accommodation.  In short, Plaintiff rejected Synthes's proposal and in response to Plaintiff's rejection, Synthes terminated her on March 3, 2016.

Importantly, it was not until *after* Plaintiff was terminated that she changed her proposed accommodation and submitted Dr. Saul's March 7, 2016 supplemental letter.  There, Dr. Saul, for the first time, proposed that after four weeks of part-time at-home work, Plaintiff could "work full time from home with the addition of seeing customers in the field and attending meetings in the office as needed."  (Defs.' SOF ¶ 92.)  Neither in this letter nor at any time did Dr. Saul indicate when Plaintiff could resume travelling to educational courses or trade shows, which are two elements of her position's essential functions.

Moreover, despite submitting the March 7th supplemental letter, neither Dr. Saul nor Plaintiff were confident that she could have successfully returned to work under the parameters proposed in the addendum, and Dr. Saul did not feel that Plaintiff was well enough to return to work "anywhere or un[d]er anyone" at that time.  (Defs.' SOF ¶ 94; Pl's Dep. at 215:19–216:7.) Dr. Saul expressed concern about Plaintiff's return to full-time work, including travelling.  In an email, dated March 3, 2016, between Plaintiff and Dr. Saul, and in reference to Synthes's counter-proposal for Plaintiff's return to work, Dr. Saul stated "I guess it's up to what you want to do.  I don't think it's the best for your mental health. . . ."  (Defs.' SOF ¶ 94.)  Thus, even viewing the light in Plaintiff's favor, I do not find that Dr. Saul's belated March 7th supplemental letter creates a question of fact regarding Plaintiff's ability to perform the essential function of travel.[6]

---

[6]     In an alternative argument, Synthes contends that Plaintiff was, in fact, totally disabled during the relevant time of her attempted return (in March 2016) and for at least nine months thereafter.  In support, Synthes notes that in her November 14, 2016 ERISA Complaint, Plaintiff certified that from May 1, 2016 through November 2016, she remained completely disabled and "unable to perform, on a sustained basis, her prior occupation or any other occupation."  (Defs.' SOF ¶¶ 104, 105.)  Synthes also cites Plaintiff's application for social security in 2016, after the conclusion of her employment, in which she certified that she was "totally disabled and unable to work."  (Defs.' SOF ¶¶ 103-106).  Accordingly, Synthes maintains that Plaintiff is judicially estopped from claiming that she was able to work during the relevant time in March 2016.

This argument is unavailing.  Viewing the facts in the light most favorable to Plaintiff, her certifications in her ERISA lawsuit and social security application do not necessarily coincide with her ability to work for Synthes in March 2016.  The precedent cited by Synthes are distinguishable because, in both cases, the plaintiff employee had filed for social security and/or long-term benefits and had made affirmative statements about being unable to work *prior to* being terminated from their employment.  See Krensavage v. Bayer Corp., 314 F. App'x 421, 425 (3d Cir. 2008) ("an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the *earlier* SSDI total disability claim.") (quotations omitted) (emphasis added); see also Shafnisky v. Bell A., Inc., No. 01-3044, 2002 WL 31513551, at *5 (E.D. Pa. Nov. 5, 2002) (Two years prior to her termination, Plaintiff repeatedly certified that she was totally disabled for purposes of Social Security Insurance and disability payments).  Here, by contrast, the undisputed record before me does not clearly establish that Plaintiff's certifications as to her being disabled (as contained either in her ERISA lawsuit or request for social security benefits) were made *prior to* her termination from Synthes.

3.   Conclusion as to Failure to Accommodate Claim

In sum, I find that Synthes is entitled to summary judgment on the failure to accommodate claim because the undisputed facts reflect that Plaintiff is not "an otherwise qualified individual" under the ADA and therefore cannot establish a prima facie case for disability discrimination.

**B.  Failure to Engage in the Interactive Process**

Notwithstanding that Plaintiff has failed to establish that she was able to perform the essential functions of her position with or without reasonable accommodations, I will discuss her next claim that Synthes violated the ADA by failing to engage in an interactive process.

Under the ADA, "[o]nce an accommodation is requested, the employer is required to engage in the interactive process during which the employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them." Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014). "[T]he plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible. . . [B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations*." Donahue v. Consol. Rail Corp., 224 F.3d 226, 234–35 (3d Cir. 2000) (emphasis in original) (citations omitted).  However, "[w]hen an employee has evidence that the employer did not act in good faith in the interactive process, . . . we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect.  To assume that accommodation would fail regardless

21

of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process." Taylor, 184 F.3d at 318.

Here, it is undisputed that Synthes: (1) in response to Plaintiff's request for medical short-term disability leave, provided Plaintiff with twenty-six weeks of leave, beginning on May 22, 2015, (2) considered Dr. Saul's request at the end of Plaintiff's short-term disability in November 2015 for Plaintiff to work from home, (3) responded to Dr. Saul by denying Plaintiff's request but, alternatively, providing Plaintiff with several months of additional leave. Sythnes also kept Plaintiff's position open for additional time beyond its typical policy.

Synthes also notes that it further demonstrated good faith by reaching out to Dr. Saul in January 2016 to discuss how and when Plaintiff could return to work, conducting a meeting with Synthes staff to evaluate Dr. Saul's January 29th letter proposal for Plaintiff to return to work in phases but exclusively from home, and extending a counter-proposal to Plaintiff to incorporate her time working in both the office and out in the field with customers. Synthes also points out that Plaintiff withdrew from engaging in the interactive process by refusing to accept Synthes's counter-proposal and refusing to explore any alternative accommodations.

Plaintiff responds that Synthes failed to engage in the interactive process and demonstrated bad faith by refusing to provide the accommodations requested by Dr. Saul's January 29, 2016 letter and by failing to consider Dr. Saul's March 7, 2016 supplemental letter of Plaintiff's requested accommodations.

This argument is meritless. Plaintiff seems to fault Synthes for failing to consider Dr. Saul's March 7th supplemental letter, yet Synthes put Plaintiff on notice as early as October 2015 that it could not approve a plan through which she worked entirely from home without any indication of when she would return to the office or travel. As noted above, Plaintiff never

provided clarification on this point in the months prior or during the discussions with Synthes about reasonable accommodations.[7]

The undisputed facts reflect that Synthes internally evaluated and considered each of Plaintiff's requests prior to her termination. Between October 2015 and March 2016, Synthes corresponded with Plaintiff and her physician numerous times about potential accommodations, but Plaintiff rejected the proposed accommodations that would have enabled her to meet the essential functions of her position. Synthes did not have to wait indefinitely for Plaintiff to return to the essential function of travelling, particularly where neither she nor her physician could say when she could return to working in the field or in the office. Henderson v. Edens Corp., No. 09-1308, 2015 WL 4977189, at *8 (E.D. Pa. Aug. 20, 2015) ("[T]he weight of authority in the Third Circuit, as well as other Circuits, clearly establishes that a leave of absence for an indefinite duration is not a reasonable accommodation." (citations omitted)); Reifer v. Colonial Intermediate Unit 20, 462 F.Supp.2d 621, 636 (M.D. Pa. 2006) ("It is utterly unreasonable and not within the mandate of the ADA to expect an employer to accommodate an employee with an indefinite leave of absence."). And indeed, in a March 3, 2016 email, Dr. Saul expressed concern about her return to full-time work in the office and travelling, and said "I guess it's up to what you want to do. I don't think it's the best for your mental health. . . ." (Defs.' SOF ¶ 94.)

Based on the above, and viewing the record in the light most favorable to Plaintiff, I find that Synthes is entitled to summary judgment on this claim because the undisputed facts reflect

---

[7]     In a further attempt to establish Synthes's bad faith, Plaintiff points to notes in Synthes's Human Resources files, which reflect Synthes's internal evaluation and discussion of Plaintiff's requested accommodations. Upon review of the undisputed record, I do not find that such notes create a dispute of material fact as to Synthes's participation in the interactive process.

that Synthes properly and reasonably engaged in the interactive process and provided Plaintiff with multiple avenues to consider, propose, and discuss proposed alternative accommodations.

### C. <u>Hostile Work Environment Claim</u>

Finally, Synthes moves for summary judgment on Plaintiff's hostile work environment claim, arguing that it is untimely and barred by the statute of limitations.  Plaintiff responds that the claim is not barred by the statute of the limitations based on the continuing violations doctrine.

To timely file a claim for a hostile work environment, a plaintiff must file a charge of discrimination with the EEOC within a certain time frame after the alleged unlawful employment practice occurred, which is 300 days for purposes of the ADA and 180 days for purposes of the PHRA.  <u>Mercer v. Se. Pennsylvania Transit Auth.</u>, 26 F. Supp. 3d 432, 443 (E.D. Pa. 2014), <u>aff'd sub nom.</u> 608 F. App'x 60 (3d Cir. 2015); <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 164 (3d Cir. 2013).  "A claim is time barred if it is not filed within these time limits."  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 109 (2002).

One exception to these requirements is the continuing violations doctrine.  <u>Mandel</u>, 706 F.3d at 165–66.  "To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period."  <u>Id.</u>  In reviewing whether an employer's conduct constitutes a continuing violation, courts must "consider the frequency of the actions and whether they relate to the same subject matter" such that they "constitute the same type of discrimination."  <u>Lamb v. Montgomery Twp.</u>, 734 F. App'x 106, 111 (3d Cir. 2018).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 113.  A discrete act, such a

termination, "in itself constitutes a separate actionable unlawful employment practice." Mandel, 706 F.3d at 165.

Here, Plaintiff alleges that Synthes's hostile conduct includes the incident in late 2013 during which her co-worker, Mr. Horan yelled at Plaintiff, Plaintiff's subsequent reporting of this incident to her supervisor, and her supervisor's response that Plaintiff should work it out herself. Further, Plaintiff claims that after this incident, she was subject to discipline and a performance warning for making negative comments in the workplace. The final performance warning, signed by Plaintiff on August 13, 2014, was issued because Plaintiff was making negative comments about her supervisor to co-workers. From that time on, Plaintiff contends that her stress levels continued to increase, eventually causing her to take a medical leave. According to Plaintiff, all of the above constitutes Synthes's "ongoing and continuous conduct" to trigger the continuing violations doctrine.

Plaintiff's argument is unavailing. Even assuming that on the latest relevant date of August 13, 2014 (the date that Plaintiff signed the final performance warning), Synthes had exhibited some form of hostile conduct against Plaintiff, this action occurred well outside of the requisite statutory time periods for the ADA and PHRA. Three hundred days (as required by the ADA) after August 13, 2014 was June 9, 2015, and 180 days thereafter (as required by PHRA) was February 9, 2015. Yet, Plaintiff did not file her charge with the EEOC until September 20, 2016. Because Plaintiff does not allege any conduct by Synthes that occurred within the statutory time required by either the ADA or PHRA, Plaintiff has not established that any alleged continued unlawful acts salvage her claim. Accordingly, Plaintiff's claim for hostile work environment is time-barred.[8]

---

[8]    Plaintiff does not claim that her termination triggered the timing for the continued violation theory. Nonetheless, I find that the incident with Mr. Horan and Plaintiff's subsequent

## IV.   CONCLUSION

For the reasons set forth above, Synthes's motion for summary judgment will be granted

on all claims.  An appropriate Order follows.[9]

---

discipline was distinct from her later termination.  At best, her termination may be a tangentially related consequence of the original conduct, which would not trigger the continued violations doctrine.  Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d Cir. 2001) (noting that a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." (citations omitted)).  Accordingly, the continuing violations doctrine does not apply to Plaintiff's claims.

[9]      Plaintiff requests that I strike the final clause contained within paragraph 59 of Defendant's SOF (ECF No. 25-3), which reads, in part, "Ms. Burke . . . her head."  The clause pertains to a discrete act that Plaintiff allegedly committed while on leave and after completing an intensive outpatient therapy program.  Plaintiff argues that the clause is both scandalous and impertinent and should be stricken.  Plaintiff clarifies that it is undisputed that she was struggling with suicidal ideations such that reference to her alleged act is not relevant to the present motion.  Rule 12(f) permits a court to strike from a pleading any "impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "Impertinent" matter consists of statements that do not pertain, and are not necessary, to the issues in question."  Conklin v. Anthou, No. 10-02501, 2011 WL 1303299, at *1 (M.D. Pa. Apr. 5, 2011) (citations omitted).  A "scandalous" matter or pleading is one that improperly casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court.  Carone v. Whalen, 121 F.R.D. 231, 232 (M.D. Pa. 1988).  District courts are afforded "considerable discretion" in deciding motions to strike, such that if there is any doubt as to whether a matter in a pleading should be stricken, the doubt should be resolved in favor of the pleading.  United States v. Boston Sci. Neuromodulation Corp., No. 11-1210, 2014 WL 4402118, at *3 (D.N.J.  Sept. 4, 2014) (citations omitted).

After reviewing paragraph 59 of Defendant's SOF, I find that the allegation contained therein is scandalous as it "detract[s] from the dignity of the court" and "improperly casts a derogatory light" on Plaintiff.  Carone, 121 F.R.D. at 232.  I also find the allegation to be impertinent as it "consists of statement[] that do[es] no[t] pertain, and [is] not necessary to, the issues in question."  Conklin, 2011 WL 1303299, at *1 (M.D. Pa. 2011) (citations omitted); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976) ("In deciding whether to [grant] a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible.").  The details of this discrete alleged action by Plaintiff are neither admissible nor necessary to resolve the issues before me, particularly where it is undisputed that Plaintiff is disabled within the meaning of the ADA and PHRA based on her anxiety, depression, and post-traumatic stress disorder.  Thus, Plaintiff's request to strike this allegation will be granted.